IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               ) Case No. 19-cr-00080-RGA
v.                             )
                               )
STEPHEN SCOTT LANDES,          )
                               )
                Defendant.     )


                    Wednesday, November 27, 2019
                    9:00 a.m.
                    Sentencing


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge



APPEARANCES:


          U.S. ATTORNEY'S OFFICE
          BY:  JESSE S. WENGER, ESQ.

                    Counsel for the Plaintiff


          JOHN S. MALIK LAW OFFICE
          BY:  JOHN S. MALIK, ESQ.

                    Counsel for the Defendant

1                            - oOo -

2                    P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following sentencing

4    hearing was held in open court, beginning at 9:00 a.m.)

5

6

7              THE COURT:  All right.  Good morning everyone.

8    Please be seated.

9              Mr. Wenger.

10             MR. WENGER:  Yes, sir.  Jesse Wenger on behalf

11   of the United States.  This is the sentencing hearing in the

12   matter of United States v. Stephen Landes, Criminal Action

13   Number 19-80-RGA.  The defendant is present in the courtroom

14   along with counsel and the government is prepared to

15   proceed.

16             THE COURT:  Thank you, Mr. Wenger.

17             Mr. Malik, Mr. Landes, can you please come

18   forward.

19             MR. MALIK:  Yes, Your Honor.

20             THE COURT:  Good morning, Mr. Malik.

21             MR. MALIK:  Good morning, Your Honor.

22             THE COURT:  Good morning, Mr. Landes.  How are

23   you today?

24             THE DEFENDANT:  Hopefully I'm all right.

25             THE COURT:  All right.  So I have read a lot of

1    materials which include a revised presentence report dated

2    November 20th of 2019, the psychological evaluation that was

3    provided by both the defense and separately by the probation

4    office.  The government's sentencing memorandum which has a

5    number of attachments of various kinds.  The defendant's

6    sentencing memorandum which also has various attachments

7    including letters written by the defendant and about five

8    letters and other things from supporters of the defendant.

9    And I believe that's everything that I have gotten.  I have

10    read all of that.  Is there anything else I'm supposed to

11    have gotten, Mr. Malik?

12                MR. MALIK:  No, Your Honor.

13                THE COURT:  Mr. Wenger?

14                MR. WENGER:  I believe the government submitted

15    separately from the sentencing memorandum called SpyFly

16    Records, a packet of materials containing a lot of PII,

17    which is why it was submitted separately.

18                THE COURT:  I saw there was something at the end

19    of your sentencing memo which was like tables of

20    information, but that's not what you're talking about, this

21    is Exhibit I.

22                MR. WENGER:  No, Your Honor.  So it's not an

23    exhibit on the sentencing memorandum.  It is information

24    obtained from a company called SpyFly.

25                THE COURT:  Right.  I remember reading about

```
 1    that.  What is the point of this information?
 2              MR. WENGER:  It shows that the defendant
 3    subscribed to a website called SpyFly.
 4              THE COURT:  This is where he got, I don't know,
 5    information on 50 or 100 different people; right?
 6              MR. WENGER:  Hundreds of different people, yes,
 7    Your Honor, so that information was submitted.
 8              THE COURT:  So basically that's the backup for
 9    what was summarized in the government's submission?
10              MR. WENGER:  Correct, Your Honor.
11              THE COURT:  Okay.  All right.  Well, I didn't
12    know that you had submitted that, but I don't think I need
13    that to get the gist of what was in your memo.  So anything
14    else that you know of, Mr. Malik?
15              MR. MALIK:  No, Your Honor.
16              THE COURT:  Okay.  And I'm going to ask the
17    probation officers, Officer Cywinski, is there any
18    information that's been withheld from the presentence
19    report?
20              OFFICER CYWINSKI:  No, Your Honor.
21              THE COURT:  Mr. Landes, did you read the revised
22    presentence report?
23              THE DEFENDANT:  Yes, sir.
24              THE COURT:  Okay.  And did you discuss it and
25    earlier versions of the presentence report with Mr. Malik?
```

1              THE DEFENDANT:  I discussed the earlier one.

2    That one I didn't really have much to discuss, it was pretty

3    much to the point.

4              THE COURT:  So basically in terms of looking at

5    the final presentence report, you're satisfied with it?

6              THE DEFENDANT:  Yeah.

7              THE COURT:  All right.  And Mr. Malik, you

8    discussed the presentence reports with your client; right?

9              MR. MALIK:  Yes, Your Honor.  We discussed

10   recently was that with respect to one of the enhancements

11   initially, again, it didn't make its way to Your Honor

12   because we were able to resolve it beforehand, but the

13   enhancement pursuant to Section 2(a), 6.1(b)(2)(a), there

14   was originally an objection and then when it was determined

15   that not only the two calls to the Georgetown Wal-Mart and

16   elementary school were included, but also the Whitehouse,

17   that made three separate communications, and based on the

18   case law that resolved that issue.  So I explained to

19   Mr. Landes that though we had raised a potential objection

20   to that, that that had been resolved based on an analysis of

21   the case law.

22              I also indicated to him that there were included

23   Dr. Cooks' report in the new revised pre-sentence

24   investigation and also some information that had been

25   provided by Mr. Landes' family regarding reports to law

1    enforcement in New Mexico, there wasn't anything that was

2    changed that wasn't really of any event, that's why he said

3    there wasn't really anything to discuss.  We talked about

4    the stuff that was added that was submitted and how we

5    resolved that one objection, Your Honor.

6              THE COURT:  I take it that means at that point

7    the defendant has no objection to the presentence report; is

8    that right?

9              MR. MALIK:  Correct, Your Honor.

10             THE COURT:  And does the government?

11             MR. WENGER:  No, Your Honor.

12             THE COURT:  In that case, I'm going to adopt the

13   presentence report and by findings of fact and conclusions

14   of law and the presentence report finds the offense level as

15   15, the criminal history category as 1 for Mr. Landes and

16   that corresponds to a sentencing guideline range of 18 to

17   24 months of imprisonment, a fine of $7,500 to $75,000, and

18   1 to 3 years of supervised release, $100 special assessment,

19   and there is also restitution to the Georgetown Police

20   Department of $1,532.40.  Is that all correct, Mr. Malik?

21             MR. MALIK:  Yes, Your Honor.

22             THE COURT:  Mr. Wenger?

23             MR. WENGER:  Yes, Your Honor.

24             THE COURT:  All right.  So I thought -- can I

25   see Mr. Malik and Wenger at side bar under seal for a

1    minute.

2              (Sidebar discussion:)

3              THE COURT:  So first off, Attachment A says

4    there is nothing else, no cooperation; right?

5              MR. MALIK:  Correct.

6              MR. WENGER:  Yes, sir.

7              THE COURT:  And do you have some videos that you

8    wanted to play?

9              MR. WENGER:  Yes, Your Honor.

10             THE COURT:  And where am I going to watch them?

11   I don't see a TV.  Oh, they're going to be up there?

12             MR. WENGER:  I'm going to put them up on the

13   computer.

14             THE COURT:  No problem.  All right.  So why

15   don't we do that before you allocute -- how long are the two

16   individuals' videos?

17             MR. WENGER:  It's three files, should be about

18   twelve minutes.  And we're going -- with the videos, in

19   evidence or transcribe?

20             THE COURT:  The court reporter will write

21   down -- I don't know, do you want the videos in evidence?

22   Why don't you move the videos in evidence and they'll be

23   part of the record.

24             (End of side-bar.)

25             THE COURT:  All right.  So are there any motions

1    for a departure by the defendant?

2              MR. MALIK:  No, Your Honor, we're just going to

3    be arguing for a variance.

4              THE COURT:  And Mr. Wenger, in terms of the

5    government, the papers suggested that maybe you were moving

6    for an upwards departure or maybe you were moving for an

7    upward variance, or basically the reason for asking for it

8    could be done either way.  What is your position right now?

9              MR. WENGER:  I will proceed with an argument for

10   an upward variance.

11             THE COURT:  All right.  And you have no motions

12   for departure, then?

13             MR. WENGER:  Correct, Your Honor.

14             THE COURT:  Okay.  Since there are no motions

15   for departure, the guideline range will stay the same there.

16   And so I understand that the government has a couple of

17   statements by video from what I believe are victims.  And do

18   you want to mark them as exhibits and then play them?

19             MR. WENGER:  Thank you.  Yes, Your Honor.

20             THE COURT:  And I'm sorry, Mr. Malik and

21   Mr. Landes, you can have a seat.  They're going to be

22   twelve minutes or so.

23             MR. MALIK:  Thank you.

24             MR. WENGER:  I have marked as Government

25   Exhibit 1 -- I believe I provided a copy to the court.  And

1    Mr. Malik if you would like to keep a copy, I have a copy

2    here for Mr. Malik.  Government Exhibit 1 is a CD that

3    contains the recorded video impact statement of Neal Stong,

4    the principal of Georgetown Elementary School as well as

5    Patti Jo Johnson, the former school secretary who is the

6    individual at the school who picked up the phone when the

7    bomb threat was called in.

8              I'll just note for the Court and those present

9    that in describing what was said during the call, one of the

10   video impact statements contains a couple of expletives, so

11   I apologize for that language.

12             THE COURT:  All right.  Well, the video is

13   admitted as an exhibit to the sentencing.  And why don't you

14   go ahead and play it.

15             MR. WENGER:  For the record, first I'm going to

16   play two files which comprise the victim impact statement of

17   Patti Jo Johnson.

18             (Videotape statement of Patti Jo Johnson:)

19             MS. JOHNSON:  My name is Patti Jo Johnson.  I'm

20   the secretary at -- was the secretary at Georgetown

21   Elementary.  I worked for the Indian River School District

22   for thirty-two years, in this building for twenty years.

23             On the morning of May 9th, 2018, it was the

24   afternoon, actually, I picked up the phone, phone call came

25   through and a guy on the phone was telling me his name was

1    Rodney Fist.  "Are you taking this down?"  He said, very

2    addiment, very angry.  He said, "Are you writing this down?"

3    And this is my address, he lived on Sandhill Acres.  He

4    said, "Are you sure you're writing this down?  You better be

5    writing this down."

6              I said, "Yes, I'm writing this down."

7              And then he proceed to tell me that he had two

8    of our fifth graders buried in his basement, and that there

9    was a bomb on the premises.  And I proceeded to ask him why

10   was he doing this.  And he told me that when he was in fifth

11   grade here that he was fucking bullied and that nobody

12   fucking helped him.

13             And I tried to keep him on the telephone because

14   that's what you're suppose to do.  He then hung the phone up

15   and I went through the routine that you're supposed to do,

16   the Star 57 to trace the call, called 911, called our

17   district office and then at the same time you're thinking

18   when this is happening, he says he has two of my fifth

19   graders, I am checking the attendance.  I have to go see the

20   attendance, what fifth graders are absent.  You don't know,

21   you don't know is this a real thing, is not a real thing.

22   It gets the stress levels high.  You're in a panic.  You

23   have to keep calm.  You're responsible for this whole

24   school.  You have all these kids, over 9,100 students in our

25   school, not even in the whole complex and I want to make

1    sure everybody is safe.  You have to go into the lockdown,

2    you have to make sure kids are safe, their procedures, what

3    they're doing, they're upset, they're scared.

4              And then for some reason when this happened the

5    media finds out, you have parents that go crazy, parents are

6    calling here, they want to come get their kids.  You have to

7    keep them calm.  You're trying to do the right thing, and

8    that's what you do.  And you don't know if it's true.  The

9    dogs come, the cops have to come in, the dogs have to come

10   in, they have to check everything.  It turns this place in a

11   turmoil.  Everybody is frightened.  And they should be

12   frightened, you don't know.  They have people checking

13   everybody, the teachers, they're keeping the kids calm and

14   it's just, the whole day is, it's just ruined.  The

15   educational part of it, academically, everything is in a

16   turmoil.  It's terrible.

17   Q.    Have you had some experience with bomb threats?

18   A.    I have been thirty-two years, this is my third bomb

19   threat that I took the phone call.  We have a lot -- like I

20   say a lot of experience because you'll have bomb threats

21   every year, some schools get them in the district and your

22   school doesn't get them, but personally in those years I

23   have handled three of the bomb threats that I took the phone

24   calls for.  And these last two I think because I did the

25   trace and everything they caught the two people.

1   Q.      Thank you.

2                 (End of videotape.)

3                 MR. WENGER:  For the record, I'm playing a

4   second video containing additional part of this statement by

5   Patti Jo Johnson.

6                 (Videotaped statement of Patti Jo Johnson:)

7                 MS. JOHNSON:  In the midst of all this, somehow

8   the media finds out, I'm sure people are texting, they have

9   their phones, they're worried, it is crazy and the phone

10  rings constantly.  Parents want their children.  Everything

11  is locked down.  Obviously you can't let people in the

12  building.  They want their kids and they want their kids

13  now.  They're very upset.

14                We have special needs kids in here.  It is

15  terrible for them.  Even if we have a fire drill, they have

16  to be notified in advance because they can't even stand the

17  sound of that.  All of this, all of the commotion that this

18  happens for them is terrible.  It sets their whole day in a

19  turmoil.  They don't know how to handle that.  The teachers

20  do the best that they can.  They do have things that they

21  practice, but it still is not the real thing when that

22  happens.  It affects them in their every day structured

23  classes.  They have a structure.

24  Q.      A routine?

25  A.      Their routine is interrupted.  They cannot have their

1    routine interrupted.  It is a special needs class, and they

2    are very good about all that, but it sets them over the

3    edge.  It's a terrible, terrible thing for them especially.

4    And then all the regular kids, they're frightened.  They're

5    terrified.  The lockdown, everything is totally different,

6    and it just -- it's a terrible thing that this happened.

7    It's just not a phone call, it sets everything, parents,

8    teachers, administrators, everybody in this building goes

9    crazy because you're worried.  You want everybody to be safe

10   and you have to go through that.  It's a terrible situation.

11                (End of videotape.)

12                MR. WENGER:  For the record, I'm now playing the

13   recorded statement of Neal Stong.

14                (Videotape statement of Neal Stong:)

15                MR. STONG:  My name is Neal Stong.  I'm

16   principal of Georgetown Elementary School in Georgetown,

17   Delaware.  This is my ninth year as principal.  Thirteen

18   years in the school overall.  In May of 2018, May 9th, we

19   received a bomb threat.  Patti Jo Johnson, our secretary

20   answered the call, performed the call trace, kept the person

21   on the phone to make sure the call trace went through and we

22   were able to find out where the call originated from.  Once

23   she alerted us, we proceeded to lock down the building.  We

24   go into what's called high level lockdown where the

25   classroom doors, they're already locked, the teachers pull

1    the shade down on their doors.  The students proceed to go

2    into a safe corner of the room.  And there the teachers wait

3    for further instructions.

4         So we when we call for a lockdown, we get on the

5    PA system and we announce the teachers and the staff that

6    Georgetown Elementary, we are under a lockdown, high level

7    lockdown at this time and we repeat that message a few times

8    to make sure everybody is aware of the lockdown.

9         While we're calling that, we have a staff member

10   that also calls the police, our school resource officer, and

11   our district office to alert them of the emergency.  So that

12   was all done.  We were locked down within probably

13   thirty seconds of being alerted to the call.  And the caller

14   -- as I said, the call trace was performed.  We make sure

15   that we have somebody in the office to maintain contact with

16   the police or with our district office and then we proceed

17   to check doors, make sure everything is locked down and

18   safe.  And then we wait for further instructions from our

19   district office.

20        There have been times before we have had bomb

21   threats where we have had to evacuate the building.  We

22   don't follow that protocol anymore.

23   Q.    Why is that?

24   A.    For fear that there may be somebody who wants the

25   students outside, outside the building.  You have heard

1    stories where there has been snipers, there has been snipers

2    outside in -- outside across the street from the school or

3    the schoolyard waiting for students to evacuate.  So now

4    when we have fire drills, we have lockdowns and things like

5    that, we have procedures in place where we check the

6    hallways and things like that to make sure that we don't

7    immediately enter a hallway or exit a building unless

8    everything is checked.

9    Q.     Now, is it just this school and complex?

10   A.     That's a district wide.

11   Q.     I mean for the day of this topic?

12   A.     For the day of May, May 9th of 2018, I'm sorry.

13   Q.     The date of the bomb threat?

14   A.     Yes.

15   Q.     You executed your plan and then what else happened to

16   the other schools?

17   A.     Well, we have two other schools.  At the time we had

18   two other schools in our complex, Georgetown Middle School

19   is currently in our complex.  We also had the Georgetown

20   Kindergarten Center which is no longer in existence because

21   we have the kindergarten students now at Georgetown

22   Elementary, so there were approximately 1,800 students in

23   the building at the time.  But those two schools within our

24   same complex also locked down, so they follow all the same

25   procedures.

1          So one of the other phone calls we have to make

2     or one of the other things we have to do on our radio system

3     is alert those other schools that we're under lockdown as

4     well, so we have about 1,800, I would say with staff you got

5     1,950, almost 2,000 people that are locked down at that time

6     out of one bomb threat.

7          So we locked down.  The police come eventually.

8     They bring the bomb sniffing dogs in.  They do their search.

9     And the building eventually is cleared.  And that's what

10    occurred in this event.

11         The impact this thing has on the staff, it

12    shakes the staff up.  The students, it really has an impact

13    on.  When we have students who were as young as four years

14    old because we have preschoolers in our building, they don't

15    understand why the lights are turned off in their room, the

16    shades are pulled.  The teachers practice the drills with

17    their kids and try to get them relaxed as they can, but also

18    want to convey a sense of urgency without creating any kind

19    of panic.  We have students in our building with special

20    learning needs, with special physical needs that we have to

21    take individual procedures with.

22         For example, we have two classrooms with

23    students with autism, and a classroom that is -- it's a

24    Howard T. Ennis classroom with students with special

25    intellectual, cognitive and physical disabilities that are

1    in our schools as well.  Between those three classrooms we

2    have approximately twenty students, had twenty students at

3    the time who have special needs.  When we lock down, in a

4    situation like that, and it's not a drill, their medicine

5    might not be available.  They might be out of the classroom

6    away from their regular teacher or support staff that do

7    things like know how to comfort them and provide them with

8    that safe -- that feeling of safety.

9            For example, we have one student who was a fifth

10   grader at the time who has autism who was in our gym when we

11   locked down.  That student and all those students, for

12   example, their buses leave a little bit earlier than the

13   rest of our buses.  This happened at the end of the day,

14   that student immediately went into fear that he was going to

15   miss his bus.  And that kind of thing is something the staff

16   has to deal with.  But also it's kind of terrible for that

17   child to be put in that position where he feels a certain

18   sense of panic because his routine is disrupted.

19   Q.    All right.  Thank you.

20           (End of videotape.)

21           MR. WENGER:  Those are the -- that's the end of

22   the recorded victim impact statements.

23           THE COURT:  All right.  Thank you, Mr. Wenger.

24           All right.  So Mr. Malik and Mr. Landes, can you

25   come back forward?

```
 1                    MR. MALIK:  Yes, Your Honor.

 2                    THE COURT:  So one more question for you,

 3    Mr. Malik.  Proposed conditions of supervised release

 4    paragraph 140 of the presentence report, such things as

 5    including you shall not utilize any telephonic device to

 6    access party lines or other type of group telephone lines

 7    and then a special condition that if Mr. Landes is

 8    supervised in the district of New Mexico about consenting to

 9    search based on reasonable suspicion.  I take it based on

10    what you have said you have no objection to those

11    conditions?

12                    MR. MALIK:  That is correct, Your Honor.

13                    THE COURT:  Okay.  All right.  So Mr. Landes, I

14    think what we're going to do now is I want Mr. Malik to

15    speak on your behalf.  When he's finished, you will have the

16    opportunity to speak on your own behalf if you want to.

17    It's entirely up to.  When you're finished, then the

18    government will have an opportunity to speak, the prosecutor

19    will have an opportunity to speak on behalf of the

20    government, and after that I will explain why I'm going to

21    sentence you to whatever I sentence you to and then I'll

22    sentence you.  All right.  You understand all that?

23                    THE DEFENDANT:  Yes, sir.

24                    THE COURT:  Perhaps you can have a seat while --

25    Mr. Malik, do you want him with you while you're talking?
```

1          MR. MALIK:  It might be better if he sits down.

2     I'm not going to be all day.

3          THE COURT:  Go ahead, Mr. Malik.  I recognize

4     you on behalf of Mr. Landes.

5          MR. MALIK:  Thank you, Your Honor.  Your Honor,

6     of course this is the time for sentencing of Mr. Landes on

7     the charges of the two calls to the Georgetown Elementary

8     School and also to the Georgetown Wal-Mart.  I want to

9     preface my comments by saying when it comes to looking at

10    how disruptive, how inappropriate, how terrible causing

11    these types of swats can be, this activity calling in a bomb

12    threat, even though there is no bomb, it's just awful

13    because as we heard, it affects countless numbers of people

14    and they don't know that there is not a bomb there.  So it's

15    a very real experience for them.  We don't condone it.  We

16    know that this is just completely inappropriate behavior.

17         As I indicated in my sentencing memorandum, it's

18    behavior that I do believe that there is an appropriate need

19    for a punitive sanction that includes incarceration.  And

20    when I look at the government's papers, Your Honor, they

21    certainly do a great job of underscoring how disruptive and

22    how wrong this type of activity is.  I don't disagree with

23    any of that.

24         The one thing that I believe is a bit overlooked

25    and something that I believe the Court has to take in

1    consideration are the characteristics of this individual,

2    Mr. Stephen Landes.  And when I am going to be making some

3    comments about his conduct and how it got to where it did

4    here, I'm not suggesting that it's justification, it's a

5    key, but I think it's important to understand how an

6    individual may have gotten to this point where they did such

7    a reprehensible act.

8                  Mr. Landes is thirty years of age currently,

9    Your Honor.  He is from New Mexico.  He was raised there.

10   The presentence report indicates and as I have indicated,

11   went through high school, but during the high school years

12   and through those years he was often the target of bullying

13   himself.  It got to the point where he was withdrawn from

14   school by his grandmother, who is present in the courtroom.

15   I should also indicate that his wife, Maribel Landes, is

16   also present.  They came from New Mexico.

17                  As the Court is aware, Judy Landes raised

18   Stephen from the time he was an infant because his parents

19   were incapable of taking care of him.  She ascertained

20   custody through the New Mexico Child Protective Services

21   back in the time when Stephen was an infant.  But she was

22   the one who pulled him out of school because of the

23   bullying.  And he did continue his education.  He went to a

24   junior college in New Mexico, earned his GED, took some

25   classes there and he went to college in Texas, completed

1    about I guess a year or more, a year's worth of credits.

2         He had some experimentation with drugs and

3    various types of drugs and alcohol.  It appears that that

4    began and ended back in 2000, I believe that was around 2010

5    during his college years.  And it's noted that those issues

6    are in remission.

7         He has a work history of working in some

8    convenience stores, restaurants, and most recently as a Lyft

9    driver.  He worked for a labor, temporary agency.  So he

10   does have history of being employed, Wal-Mart.  And he also

11   has a history of being involved extensively in these chat

12   rooms, and chat rooms or party lines are, they're like phone

13   systems where a person can call in and have a conversation

14   with multiple people on these party lines.  Obviously

15   they're popular because there is plenty of them.

16        Mr. Landes indicates that he had actually

17   operated some party lines and made money from it for a

18   while.  His grandmother, Judy, thought they were not a good

19   thing, they caused problems and he ultimately stopped

20   running the party line.  But he did get into this culture of

21   party line individuals.  And it appears there is individuals

22   who become friends, they have disagreements, they argue, and

23   then they go from just insulting to doing different things

24   such as rising to the level of swatting.  It appears that a

25   lot of the individuals who participate in this party line

1    chatting are also involved in internet, they're adept at

2    computers, internet technology and they know how to get

3    information about people whether it's legally or illegally,

4    both happen -- there are search engines where you can

5    legally track people and there are ways that you can do it

6    completely illegally and both of them certainly happened

7    here by Mr. Landes and other individuals.

8              Mr. Landes, things started to go south with him

9    with his party line life-style and culture he became

10   involved in back in 2010, that's when there were these on

11   running feuds with some people, one of them in particular

12   was person one, it was the individual who was --

13             THE COURT:  It would be a lot easier if you just

14   called him Mr. Phipps.  We already had his name.  I got a

15   separate prosecution of him going on.  I understand

16   protecting noninvolved people or people that haven't been

17   charged, but he's been charged in a similar type of thing,

18   so I would just use his name.

19             MR. MALIK:  All right.  Your Honor, so Rodney

20   Phipps.  That was when Mr. Landes indicated that there were

21   disagreements and the back and forth between them started.

22   Dr. Cook indicates through history Mr. Landes had stated

23   that this started in 2010 and it escalated.  And Mr. Landes

24   indicated at first he was the object of some of these

25   pranks, but when it rose to the level of then calling the

1   police and sending them to Mr. Phipps' home and when they

2   show up and he's either killed his wife or he has a bomb, it

3   stopped being funny.

4            He's indicated it happened to him on countless

5   occasions.  He's had to relocate.  He's been evicted because

6   of this is the type of activity.  And it happened over a

7   course of years for a long time.  He indicates it didn't

8   stop with him, it started when he got married, there was a

9   tracking of Maribel and she was receiving calls at her place

10  of employment.  There were efforts to try to get her fired.

11  His mother, Judy Landes, was being the target of phone

12  calls, state phone calls trying to get information about

13  Mr. Landes, threatening information.  Judy Landes, her

14  phone, they indicated that there were calls she received

15  from her cell phone service carrier saying you want to

16  change your number and she's saying no, I don't, this is my

17  number.  And it turns out this was Mr. Phipps attempting to

18  change her number or have her service canceled, so you have

19  a history of this.

20           Mr. Landes indicated to me that there are with

21  other people who were friends on this online chat room

22  culture that had been threatened or dodged or swatted by

23  Mr. Phipps included such things as calling of child

24  protective services and making allegations that a female was

25  injecting her baby with heroin or child abuse that would

1    create a response and an investigation.  And although this

2    had happened to Mr. Landes and his friends for many years,

3    Dr. Cook indicates that when it started to hit home with his

4    mother and his wife, that's when he sort of became

5    desperate.  Dr. Cook indicates that this bothered Mr. Landes

6    to the point where he had some suicidal ideation about this.

7    We set out a couple of examples in our sentencing memo where

8    Mr. Landes and his family reached out to law enforcement, it

9    was local law enforcement in New Mexico, and it was just an

10   example.  The first one that we had submitted from February

11   of 2018 was where there was a threat that there was an

12   inmate that had been released from a prison, he was going to

13   be getting out, he was going to be coming after Mr. Landes

14   threatening him and his family.  We don't know if that was

15   Mr. Phipps or not.  Mr. Landes indicates to me that part of

16   the culture of this swatting activity is that some of the

17   more well-known people will recruit other individuals who

18   will sort of do their bidding for them and it could have

19   been somebody who did this at the request of Mr. Phipps,

20   although we don't have any proof of that.  But the main

21   dispute was between Mr. Phipps and Mr. Landes.

22           There was also another instance in May of 2017

23   where the Carlsbad Police in New Mexico were called and it

24   was recorded again, Maribel Landes indicated that she was

25   receiving calls at her place of employment, attempts to get

1    her fired, that her family were being threatened who lived

2    in California and this was also reported to the police.  We

3    also had an incident that was in July of 2018, this would

4    have been after the subject offense conduct took place here,

5    but once again it was an incident where Mr. Landes was the

6    object of swatting activity by Mr. Phipps and it was

7    reported that there were bomb threats that were made

8    suggesting that Mr. Landes was the person who was making the

9    threats.

10                 So the reason I submitted those was Mr. Landes

11   did attempt to reach out.  One of the things that's

12   mentioned in the pre-sentence report which again is a very

13   comprehensive and thorough pre-sentence report, Your Honor,

14   Mr. Cywinski did a very good job, but in indicating what

15   swatting is, this would be in paragraph 22, it's defined,

16   and then there is a comment that says, "Swatting causes

17   disruption and wastes resources and time of emergency

18   services.  Diverts attention from real emergencies and can

19   cause a risk of injuries and psychological harm to the

20   persons targeted and the first responders."

21                 So again, it's not just people who like the

22   Georgetown Elementary School and the shoppers at the

23   Wal-Mart and workers at the Wal-Mart who were impacted by

24   this, potentially it is first responders, and then

25   ultimately the people who are the targets of the swat.

1          Also in the government's sentencing memorandum,

2   Your Honor, there was a comment that I wanted to point out

3   to the Court, but that appears on page number 12 under the

4   subsection Roman numeral VI, the defendant reports to law

5   enforcement.  When commenting on the May 17th incident, the

6   government writes, what becomes apparent from reading the

7   report is the tangled web that the defendant and other users

8   of the chat lines weave and the difficulty that local law

9   enforcement has identifying suspects and addressing this

10  type of behavior in a meaningful way.  I think that rings

11  very, very true here, when you're committing these types of

12  cyber crimes, you can do it from a remote location and

13  someone here can do something from New Mexico that could

14  impact in a very significant way sleepy Georgetown.

15          Again, in Mr. Phipps' case and here, Your Honor,

16  there were multiple instances of using wire communication of

17  making these type of bomb threats throughout the country.

18  We know from Mr. Phipps' act that is before the Court, we

19  know from Mr. Landes' experience that it is very easy to

20  direct this type of response by police, by fire departments,

21  to somebody that you have a beef with, and it does take a

22  toll on people over time.

23          Dr. Cook indicated that -- he indicated that

24  Mr. Landes, I would note he not only indicated there was

25  also a psychological report that was completed on Mr. Landes

1    when he was much younger in school in 2004 by Dr. Salb in

2    New Mexico, and in that report -- excuse me, Your Honor, in

3    that report there were some things that were identified that

4    included posttraumatic stress disorder.  One of the things

5    that could not be diagnosed but was mentioned by Dr. Salb

6    was that he also was noted to have a diagnosis of general

7    social and academic problems.

8         Dr. Cook, he ultimately makes a diagnosis with

9    respect to Mr. Landes of avoidant personality disorder, and

10   that is a type of disorder where someone just does not

11   function well in social settings.  And on that, Dr. Cook

12   comments, indicates that in the empirical testing he did

13   referencing Mr. Landis, this is page 13 of his report, he is

14   significantly elevated on both the disaffiliative scale and

15   the social avoidance scale.  What this means is that he

16   dislikes people and he dislikes being around them.  He

17   prefers to be alone or with just one or two close family

18   members.  He does not enjoy special events and avoids

19   special situations.  He tends to be introverted.  These

20   findings are consistent with his history and is not an

21   infrequent finding in those that are extensively involved in

22   online communications rather than having friends in the

23   community.

24        What we have here is a person who -- we have two

25   people here that he's very close to, his wife and his

1   grandmother who raised him, but other than that, he really

2   doesn't have any other friends, very consistent with this

3   avoidant personality disorder.

4            Dr. Cook continues and he indicates there that

5   he was trying to see how this act could have come about.  He

6   continues in the next paragraph that says restructured

7   clinical scales show a pattern marked particularly by ideas

8   of persecution, though in the case of Mr. Landes, there

9   seems to be an adequate reality based for feeling that he

10  was persecuted by Phipps and others.  This testing also

11  reflects a lot of underlying anger.  This anger was

12  generally related to abuse by his mother, exacerbated by the

13  physical abuse that he suffered by other children in school,

14  that would be the bullying in school and finally by the

15  pattern of being harassed over the years.  These scales also

16  reflect the above mentioned tendency towards social

17  avoidance and indicate a major reason for this is the lack

18  of sense of identity there had been of where he actually

19  fits in socially or in the world in general.

20           So we have Mr. Phipps targeting a person who has

21  diagnosed emotional issues and mental health diagnosis, a

22  person who is going to be particularly susceptible to these

23  types of threats.  He didn't stop at one or two, he did it

24  consistently and it got to the point where Mr. Landes

25  reached out and he felt that in his mind what he was doing

1    was trying to protect himself, his wife and his mother.  He

2    thought that if he did this, it would stop Rodney Phipps and

3    he indicated that he would get caught but so would Rodney

4    Phipps.  And that's what happened, both of them did get

5    caught.  At first Mr. Landes when he was interviewed on the

6    telephone denied this, but then after he was arrested, he

7    was interviewed in New Mexico by the FBI agent, and that

8    interview was well over three hours and Mr. Landes basically

9    described everything that happened.  He confessed to

10   everything and he confessed in incredible detail almost

11   giving a verbatim recitation of what was spoken on the phone

12   when these calls were made in to the school and to the

13   Georgetown Wal-Mart.  So he was very forthcoming about what

14   he did, gave a lot about how this happens and what happens

15   in this subculture of chat rooms and party lines.

16            So my point, Your Honor, this is something that

17   has to be punished.  There is already been a decent amount

18   of punitive sanction.  Mr. Landes has been incarcerated, I

19   put down November 19th, 1919, it was actually 1918, this is

20   the date of it, Mr. Landes was taken into custody as of

21   November.

22            THE COURT:  That's what I have.  That's the date

23   that I have written down.

24            MR. MALIK:  I had looked at the wrong date.  The

25   date of the detention rather than the date of actual

 1    physical custody, Your Honor, so I wanted to correct that

 2    and I thank you for noticing that, Your Honor.  But he's

 3    been incarcerated for about a year and two weeks I think

 4    almost to the day.  We believe again if you look at the

 5    factors that the Court has to consider pursuant to 18 United

 6    States Code Section 3553(a), the Court of course has to

 7    impose a sentence sufficient but not greater than necessary

 8    to comply with the purposes set forth in paragraph two.  And

 9    then as far as we have subparagraph one that talks about the

10    nature and circumstances of the offense and history and

11    characteristics of the defendant, I just believe that the

12    government does not really address my client's history and I

13    think that his history of having emotional issues, his

14    history of being bullied and his history of actually being

15    targeted by Mr. Phipps are something that the Court should

16    take into consideration as mitigating factors.  This was not

17    a completely unprovoked situation.  Again, it's not right,

18    it has to be punished, but I do think when you look at the

19    behavior that led or the experiences that led to Mr. Landes'

20    behavior, that it does mitigate the very wrong thing that he

21    did.  And that's why I would ask the Court to take into

22    consideration.  I do believe there is a need for punishment

23    as said at the outset, society has to be told that this is

24    not something that will be stood for, there will be

25    punishment, there will be incarceration if this kind of

1     conduct is encountered in the future.

2              I believe the Court could protect the public

3     from future actions by doing a couple of things.  One is

4     making sure Mr. Landes gets some type of counseling, some

5     type of psychological counseling.  He desperately needs

6     that.  He has some issues.  He's not an unintelligent

7     person, but there are issues and he has not been receiving

8     any type of counseling.  I also believe strict conditions

9     such as ones that were in the presentence report would be

10    particular appropriate.  They're necessary whether there is

11    an additional sentence or not.  At some point Mr. Landes

12    will be placed on supervised release and I think limiting

13    his access, I believe that his wife, I believe that his

14    grandmother would probably be very, very happy if the Court

15    said you cannot participate in any chat lines, party lines.

16    If you do, it's a violation of your supervised release and

17    you'll be back here and be subject to further incarceration,

18    but I believe that's something that could be imposed.

19             I believe that limiting his access to computers

20    and having a situation where it can be checked by probation

21    to make sure that he's not accessing anything that he's not

22    supposed can be another check.  It appeared that Mr. Landes

23    can be home with his family, go to work, and stay off of

24    these, this subculture of chat lines and party lines that he

25    probably can function if supervised in a much better

1   fashion.   In fact, Dr. Cook indicates that if there are

2   things put in place he has a very low chance of recidivism

3   based on one of the scales that he utilized.   I believe it's

4   a scale that's utilized in the state Department of

5   Corrections for anticipating whether somebody is at a high

6   risk of recidivism or not.

7            Your Honor, I know that my client's actions were

8   very inappropriate and they harmed a lot of people.   My

9   client did write two letters to the Court and he wanted

10  those letters to also be conveyed to the people at the

11  Georgetown Wal-Mart and Georgetown Elementary where he

12  apologizes for his actions.

13            THE COURT:   I'm sorry, Mr. Malik, you said

14  letters to the Court.   I have got the letters that are

15  addressed to Wal-Mart and Georgetown.   Was there a third

16  letter?

17            MR. MALIK:   No, Your Honor, I misspoke.   The

18  letters that were submitted to the Court, but they were

19  addressed to the Georgetown Wal-Mart and to the Georgetown

20  Elementary School.   He indicates in both letters, I would

21  like to properly and sincerely apologize to Wal-Mart and he

22  also mentioned the Georgetown Elementary School in a

23  separate letter to the workers, the customers, the people of

24  Delaware, the innocent children for the elementary school,

25  the police, all kinds involved, I would like to apologize

1    for the distress, panic and loss of monetary funds for the

2    store for the moment.  And he also indicates I would like to

3    apologize for the distress, panic and fear I caused those

4    parents with respect to the Georgetown Elementary School.

5    He continues, I'm sorry for any stress, mayhem or any

6    possible destruction I may have caused and he indicates I

7    was just trying to protect the people I care about.  I had

8    no intent of using a real bomb or harming a child.  That

9    shows you what his thought process was.  That's not a

10   thought process he can continue to have, because as I have

11   explained to him this is not a situation where you can

12   utilize this type of swatting activity as a self defense

13   even if you're being targeted yourself.  And I do believe he

14   understands this.  As he said to me on multiple occasions,

15   that is the reason that he did this.

16            Mr. Landes also had asked that I read a couple

17   of things to the Court that he provided to me today.  He

18   indicated that he does not feel comfortable speaking in

19   public.  That's not something that he likes to do.  So he

20   asked that I read a couple of things to the Court.  I was

21   going to do that right now if I could.

22            THE COURT:  Okay.  And so does that mean you,

23   Mr. Malik, when I asked him whether he wants to speak, he

24   will say no, Mr. Malik already did it?

25            THE DEFENDANT:  Yes.

```
 1              THE COURT:  Can you stand up for a second,
 2    Mr. Landes.
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  So you do have a right to speak to
 5    the Court, and when you do, when a defendant does, I always
 6    listen to what they say.  You also can certainly have
 7    Mr. Malik say things that you want to say, particularly if
 8    -- well, you can do that period, but you do understand that
 9    not everyone is comfortable speaking in public.  Mr. Malik
10    does it for a living, so he can convey the sentiments, but
11    if you change your mind and you want to say anything when
12    he's done, just let him know and I will let you speak
13    anyhow, but right now I'm taking it that you don't want to
14    speak and Mr. Malik can go ahead.
15              THE DEFENDANT:  I want to do a brief, very, very
16    brief.
17              THE COURT:  That's all right, you can do that.
18              Go ahead, Mr. Malik.
19              MR. MALIK:  Okay, Your Honor.  I want to read
20    some of the comments that Mr. Landes asked me to put forth
21    before the Court.  I am an elite hacker.  I do not like
22    swatting or swatters.  Before I was incarcerated, I would
23    have given a list of fifty swatters doing
24    ninety-eight percent of awful swat calls, that this could
25    have annihilated swatting nationwide and taken swatting from
```

```
 1    400 a year to less than ten.  Swatting is dangerous for
 2    people being swatted.  There is no self defense.  Law
 3    enforcement nationwide does not know what it is or how to
 4    protect people from it, making it even more dangerous.  If
 5    law enforcement could have better protected my family, I
 6    would have never made the swat calls.  Hundreds would have
 7    been protected from Rodney Phipps and others and if they
 8    stop the swatters in 2001, 2009 instead of just stopping
 9    Matthew Weinman for swatting when they caught them and keep
10    letting them off, thousands of people would have been
11    protected and Andrew Finch would still be alive.  Andrew
12    Finch, Your Honor probably remembers who.
13              THE COURT:  I remember the gist of what the
14    government put in.  I don't remember the names or the
15    people.
16              MR. MALIK:  That was the one from Ohio where
17    there was the people who were doing some online game got
18    into an argument over $1.50, there was a swat put out and
19    one person got another young man in Ohio to make a swat call
20    and there was a person in Wichita, Kansas who was at home,
21    this wrong address was given, not that there is a right
22    address in the first place, but when the police came out, he
23    moved his hands in such a way and he was shot and killed,
24    the Andrew Finch case, that's the pinnacle of this awful,
25    awful behavior.  And Mr. Landes continues.  As far as
```

1    pulling info, I did do that, but not to swat people.  I did

2    it to help people that come up missing for their family.

3    One person on there was Tara Pyle.  I was helping an FBI

4    agent named Betty Lasardo recover a stolen car.  There were

5    friends, family, myself, people on party lines, leave you

6    alone.  If you read them their info, it scares them,

7    especially since being swatted is something that they have

8    witnessed and they are scared of.  Ninety-nine percent of

9    them act like they are your friend if you have their

10   personal information.  The place in Jersey, the threat at a

11   prison was not me.  I took the blame for somebody else that

12   I will not mention.  This is mentioned in my psychological

13   evaluation.

14            In the case of Rodney, I ignored him so my wife

15   became a target of his attacks.  And then every time he

16   attacked, I went one step farther trying to get him to stop,

17   started by pulling his info and then hacking his accounts,

18   then hacking his chat line and phone and e-mails, then the

19   insurance, the towing of vehicles, reported him as a

20   terrorist, then putting car insurance in his name through

21   multiple agencies.  Over two years he wouldn't stop and

22   leave me alone, so I swatted him to protect my life.  Luwan

23   is the woman who had the child I was attempting to protect,

24   and most importantly that day, Crystal Ramos and her

25   children, little kids don't follow the media like the news

1   nor are they frightened if they don't know what is

2   happening.

3           Your Honor, there was another letter that he had

4   written, and he indicates in this letter in the sentencing

5   memorandum the government has linked cases to me in an

6   effort for enhancement of up to thirty-seven months, and

7   these cases do not apply to me.  I have official news

8   reports and the magazines to prove the unbiased real story

9   of Tyler Burris and Shane Gastle that led to the death of

10  Mr. Finch, and some of the soft stories were committed by

11  Rodney Phipps.  I have only swatted two people since the age

12  of eighteen.  Eight people called in and reported a person

13  trying to solicit a twelve-year-old girl for sex.  After

14  nothing was done, I called and said I was an active shooter.

15  Right after I made the call she stated in the Facebook group

16  chat that she was about to arrive at his house.  She was on

17  a video camera when she arrived at his house.  The police

18  were searching his house while she was talking to the

19  police.  This person was known as a sexual predator

20  throughout the party lines that had learned at least

21  thirty-seven females between the age of eight and

22  fifteen years old, at least two of which became pregnant.

23  The other person was Rodney that he swatted that maliciously

24  150 of my friends across the country.  He also affected my

25  family, my wife and least importantly myself by swatting.  I

1    was swatted by Rodney countless times over a six-year time

2    frame.  Sometimes when I was swatted by Rodney there were

3    others that followed.  There are some names mentioned here

4    who would also participate in the swatting.

5             Again, Your Honor, my client, having discussed

6    this with my client on countless occasions, the one thing

7    that I keep on getting from him is I was being attacked, I

8    was frustrated and I thought this was the only thing I could

9    do.  Completely the wrong thought process, it was an

10   absolute wrong exercise of judgment on his part and as I

11   said at the beginning, I don't believe that justifies

12   anything, but when you look at somebody who was targeted by

13   Mr. Phipps who was an easy mark, somebody who was going to

14   be particularly successful because of their history of

15   bullying and psychological problems, this is the type

16   psychological harm that can be piled on a person who is

17   already wrestling with psychological issues and can lead

18   this to type of behavior that impacts others in a

19   threatening way.

20            So for those reasons, Your Honor, I'm

21   respectfully asking the Court to look at the situation and

22   impose a sentence of time served.  That sentence would

23   include as I said, a year and fourteen days of

24   incarceration.  I also ask the Court to consider imposing a

25   sentence of home confinement, typically they're around six

1    months, that can be a further punitive sanction not so much

2    but a little bit more, supervised release but it would allow

3    there to be very close supervision restrictions on

4    Mr. Landes to make sure that he gets into some type of

5    counseling program and sticks with it, he doesn't have

6    access to party lines, chat lines, limited computer access

7    and then that be followed by a period of supervised release.

8             I believe his return home to New Mexico with his

9    family with supervision just as Dr. Cook stated I don't

10   believe there would be a high chance of recidivism.  If the

11   Court were to conclude that an additional period of

12   incarceration were necessary, I would respectfully ask that

13   the Court would consider imposing it within the guideline

14   and that the Court consider making a reference to a facility

15   that would allow there to be a complete psychological and

16   psychiatric evaluation and have some treatment during any

17   remaining time Mr. Landes would have to serve in prison.

18             Thank you, Your Honor.

19             THE COURT:  Thank you Mr. Malik.

20             Mr. Landes, why don't you come forward.  As I

21   said, Mr. Landes, you have a right to speak and I understand

22   you do want to speak and so you have the floor.

23             THE DEFENDANT:  All right.  Would it be okay if

24   he reads this real quick?

25             THE COURT:  Sure.

1             MR. MALIK:  Let me get my glasses.  What's been

2    handed to me is a letter, it looks like it is from Lexi

3    Smith to -- that's just -- it looks like to whom it may

4    concern, dated May 7, 2019.  I have known Stephen Scotland

5    Landes for fifteen years or longer as a friend, business

6    partner on the chat lines, party lines.  I can absolutely

7    beyond a shadow of a doubt vouch for him and say he is a

8    person of high moral ethics and integrity.  He's a very

9    respectful and trustworthy person.  He was highly loved by

10   most people he came into contact with over the phone or in

11   person.  He's dedicated and loyal to his family and friends.

12   Stephen has also been known to be so kind to be charitable

13   to people that needed help.  He has been very helpful and

14   loyal and the best friend I can ever ask for.  My fiance has

15   been swatted in the past and the case number is known by

16   several people involved in this case.  I'm one to testify

17   that everything stated within the statement is true.  Thank

18   you for the time and reading this statement as I know your

19   time is valuable.  Signed Luwan McConnel.  And that's the

20   entirety of that document.

21             THE COURT:  It's signed McConnel?  I thought it

22   said Lexi Smith?

23             THE DEFENDANT:  The e-mail is Lexi Smith, but

24   it's Luwan McConnel.  I don't know which one is her real

25   name, but that's what she goes by on the party lines.

1        THE COURT:  Okay.  All right.  Go ahead,

2   Mr. Landes.

3        THE DEFENDANT:  My reason in presenting this was

4   an interesting fact.  She was one of the people who turned

5   the statements on me saying I'm the one that made the phone

6   calls on Rodney and then was assisting me with getting me

7   contact to the outside world because the feds were limiting

8   my communication.  She was also swatted by Rodney.

9   Mr. Malik misspoke, she was not the one with the children,

10  she was just another person being swatted at that moment by

11  Rodney.  The person being swatted was Crystal Ramos.  When I

12  made the phone calls that I made, and this is what I wanted

13  to say on the record, the situation with Crystal Ramos was

14  sitting there getting hit over and over by Rodney.  He was

15  saying she was injecting her children with heroin.  He was

16  maliciously attacking her.  She was crying.  She was

17  threatening to kill herself.  Her kids were trying to be

18  taken away.  They were being sent over and over.

19        Well, they came in there and she is diabetic and

20  they had a needle on the counter.  They took two of her kids

21  and put them in custody.  When I made the phone calls that I

22  made, that was at approximately 1 o'clock that day.  Then he

23  was sitting there on Facebook throwing up my personal info

24  and threatening to swat me, which I've been a victim of

25  swatting for six years minimum, countless times.  So that

1    was going on.

2              And then he was attacking my wife trying to get

3    her work information and stuff.  And he was throwing up all

4    kinds of insults.  He was like, "I'm going to get your fat

5    fucking granny over here, I am gonna make her suck my dick

6    while having your wife suck my dick."  And I was like, "Yo,

7    leave my family alone."

8              He kept attacking me.  He was jumping in chat

9    rooms and Facebook chat groups, sitting there throwing up

10   info and then he reads off my Molina health care

11   information.  After he read off the health care information,

12   it threatened -- excuse me, he's sitting there threatening

13   me on health care and stuff.  I said how do you get my

14   health care info because I didn't think it was mine.  I went

15   over and got my card and checked it.  This was on camera

16   with twelve people on the phone call.  When I check, that's

17   my health care.  He told me that Wal-Mart is the one that

18   gave it to him.  Wal-Mart gave him my info twice through two

19   different agencies.  Cancelling my medicine which I had

20   heart medication and stuff.  And that is attempted murder

21   because if you don't have any medicine, I'm stressed out I

22   have a heart attack, so he was messing with my heart

23   medicine, kept sitting there and doing that.

24             As far as swat calls, I don't like swat, I don't

25   like it at all.  And I was sitting there and I was on a

1    phone call and I had again twelve people on Facebook in a

2    video chat and forty-eight people in a phone call when I

3    made those phone calls and it was on the basis to protect my

4    wife and Luwan, and most importantly Crystal and her

5    children.  When I made those phone calls, I chose to

6    incarcerate myself and take him with me.  I had every intent

7    of being caught, otherwise the FBI would have never caught

8    me.  I could have used a spoof.  I could have forwarded, I

9    could have made it where they would have never caught me.  I

10   made sure using star 67, you call any private number, you

11   hit star 73, it will reveal the caller identity.  I

12   intentionally called and set myself up knowing I was going

13   to be arrested just to get protection from my family of

14   which after I was incarcerated, Mike Virus, who is another

15   one who was swatting me with Rodney and the phone calls in

16   question and stuff, like where I was evicted eleven times

17   because of Rodney.  I lost three jobs because of Rodney.  My

18   wife, he was messing with her job.  There is questionability

19   if she lost at least one job because of him, maybe more.

20          My whole family, he was pulling their info, he

21   was just doing continual harassment.  He wakes up at

22   10 o'clock in the morning and threatens people until

23   3 o'clock the next morning and alternates the swatting.  I

24   know of at least 150 people that was swatted.

25          And I would also like to submit a paper off the

1    record at the end of this before I go, of a list of things,

2    but anyways.

3                    THE COURT:  I'm not sure what you're talking

4    about off the record.  You want to do something on the

5    record, there is an FBI agent sitting next to Mr. Wenger,

6    you can talk to him.  But he knows what we're doing here, so

7    let's stay focused on your sentencing.

8                    THE DEFENDANT:  Yes, sir.

9                    As far as the whole situation was going, I tried

10   everything.  I contacted law enforcement for years.  I

11   contacted the FBI.  You call the local law enforcement, they

12   say contact this law enforcement.  You call them they say

13   contact yours.  You contact the FBI, they say we're out

14   there chasing real criminals.  I was frustrated to think

15   they weren't listening to me.  Local police came out to my

16   house and held me at gunpoint through a lot of different

17   residences because of him.

18                    I was sitting there getting held at gunpoint and

19   the cops and stuff are making jokes about it.  The police

20   department even told me to defend myself.  They told me that

21   if it was beyond reasonable doubt self defense, do it,

22   that's why I made the call because I had no other options

23   around it.  I couldn't do something, you ain't got a place

24   to live, you can't get a job or nothing, that's tampering

25   with your life situation.

1          And this was continuing and then he started

2     messing with my medical and stuff, and then he was

3     definitely repeatedly attacking Crystal.  It was a two-day

4     thing where he was sitting there attacking her and when I

5     spoke to the FBI, this is something that the FBI is

6     admitting.  They're not doing anything but representing

7     Rodney like they're a defense counsel.  So the thing is when

8     I spoke to the FBI, this is my discovery, I don't know if

9     you have ever seen my discovery.

10          THE COURT:  No, I haven't.

11          THE DEFENDANT:  It is distinctly stated that the

12    reason I agreed to speak to them is because somebody's life

13    was on the line.  There was a girl named Cassandra Moore who

14    used to be my brother's ex-girlfriend who was swatting a guy

15    named Avon and he tried to hang himself three times the day

16    before because she had been swatting him repeatedly for over

17    twenty-four hours.  I was defending him and told him and

18    they never even cared about that situation.  It had never

19    been brought up.  I don't know if he ever killed himself or

20    what because then I was incarcerated so I don't know what

21    happened.  He was in the process, he had hung himself

22    repeatedly and tried to kill himself.  And that's why I

23    agreed to talk to the FBI.

24          I am hoping that you can find it in your heart

25    to let me go home to my wife today.  I have been -- I'm the

1    type of person that I'll go out of my way to do anything for

2    people.  During my time at incarceration at FDC, I caught

3    one dude, he was having a heart attack.  I caught him and

4    helped him to floor.  I paid the debt of four people who

5    were gambling just so they would not be murdered by people

6    because they had less than fifteen minutes to come up with x

7    amount money and I did without food for a month just so that

8    they wouldn't be murdered.  That's the type of person I am.

9    I'm not a malicious person.  I am not a vindictive person.

10               That is all I have to say Your Honor.

11               THE COURT:  Thank you, Mr. Landes.  Why don't

12   you and Mr. Malik have a seat.

13               MR. MALIK:  Thank you, Your Honor.

14               THE COURT:  Mr. Wenger, how long do you expect

15   to be?

16               MR. WENGER:  Five to seven minutes, Your Honor.

17               THE COURT:  Okay.  Go ahead.

18               MR. WENGER:  Thank you, Your Honor.

19               You heard in the video recorded victim impact

20   statements, Stephen Landes is not the victim here.  The

21   victims are the 1,800 children who were forced to huddle in

22   the corners of their classroom during a high level lockdown

23   after the defendant purposefully targeted an elementary

24   school with a bomb threat.  The school children whose day

25   was upended by the defendant's aberrant threats included

1    students as young as four years old in preschool and

2    classrooms full of special needs student.  In today's world

3    with the horrors of school shootings that dominate the

4    airways recently, these sorts of threats create an

5    atmosphere of fear and panic not only for the students and

6    school personnel, but for the parents who have to wonder

7    whether their children are going to be coming home from

8    school safe that day.  The defendant wants to shift the

9    focus away from those children and paint himself as a victim

10   forced to commit the crime to stop himself from being

11   subject to virtual harassment and swatting from one of the

12   enemies from the party lines, Rodney Phipps.  He claims he

13   had no other choice but to call in a bomb threat to an

14   elementary school.  But for the defendant to suggest that he

15   simply had no other choice to deal with his problems than

16   the target school children with a bomb threat is offensive.

17   There is no justification for purposefully targeting an

18   elementary school with a bomb threat and then claim that

19   children are being held hostage.  The defendant's notion

20   that he's a helpless victim, that had to resort to swatting

21   behavior to defend himself is simply not supported by the

22   facts.

23         The defendant for his entire adult life and

24   likely longer and as you have heard from defence counsel,

25   he's been an active and voluntary participant in the world

of telephonic party lines and internet forums frequented by
computer hackers like the defendant.  And in that world,
virtual friends become virtual enemies at the slightest
grievance.  In that world, as you have heard, the grievances
are settled by stealing each others personal identifying
information to orchestrate a swatting attempt and other
forms of virtual harassment and intimidation.  The victims
are not the individuals like the defendant and his supposed
enemies who have spent years attacking each other.  The
victims are the innocent bystanders who are caught in the
crossfire, and emergency service departments across the
country who have to waste their resources responding to
these false threats.

          The evidence the government has submitted to the
Court demonstrates that the defendant has been an active
participant in the world of swatting and other forms of
online harassment for years.  The suggestion that he only
again engaged in this behavior out of a sense of
helplessness is not supported by reality.  Engaging in this
behavior, that's just what you did to people that you didn't
like.  For example, the SpyFly record that I referenced
earlier and I discussed with the government sentencing
commission, showed that during the year leading up to the
May 9, 2018 bomb threat, the defendant used an online
subscription to look up the personal identifying information

1  of hundreds of people, including the family members of his

2  party line and online adversaries.  Looking at the

3  defendant's own messages that were attached to government

4  sentencing memorandum, we know what the defendant did with

5  that information, either sold it or weaponized and

6  interfered with the daily lives of numerous individuals.

7  The trust I.D. records that are also included in the

8  government sentencing memorandum show that the defendant

9  gained access to a nearly untraceable caller I.D. spoofing

10  application that the defendant and others have used to

11  orchestrate swatting attempts across the country.  The

12  records show that the defendant placed numerous calls using

13  that spoofing application including swatting calls he has

14  admitted to making.

15         The defendant has offered police reports that

16  supposedly corroborate that he is a helpless victim and he

17  couldn't defend himself.  The review of those reports as

18  Mr. Malik mentioned only show one instance where Mr. Landes

19  went to police and specifically referenced Mr. Phipps and

20  that happened over a year before the May 2018 bomb threat at

21  issue here.

22         The Court shouldn't believe the defendant's

23  after-the-fact excuses for his behavior, rather the Court

24  should look at the defendant's own words that were included

25  in the exhibit after the government's sentencing memorandum

1   and the defendant explained to a friend why he called in

2   bomb threats to Georgetown Elementary School and Wal-Mart

3   and he explained that he did it because he just didn't like

4   Rodney Phipps.

5            As Your Honor has seen in this case, the goal of

6   swatting behavior is to get a large police or swat team

7   response to show up at a target's house by providing that

8   target's address as a location of a purported emergency.

9   And indeed in this case the defendant was disappointed with

10  the level of the police response he was able to muster to

11  Mr. Phipps' house when he engaged in what he called minor

12  swats in the six months leading up to the May 9, 2018 bomb

13  threat.  So what did the defendant do?  He purposely ramped

14  up his behavior and specifically targeted an elementary

15  school so that the police would have to respond more

16  forcefully to that threat than to his other swatting

17  behavior.

18           Swatting attacks have became a dangerous

19  epidemic across this country.  As the government's

20  memorandum shows, a simple news search shows how prevalent

21  it has become.  Swatting calls often use sophisticated

22  technological means to mask their identities and that makes

23  it difficult for local law enforcement to trace the origin

24  of this call.  The local police departments, they lack the

25  time and the resources to investigate these interstate

swatting calls.  What does that even mean?  It means that

individuals think that they can swat each other with

impunity.

The swatting calls are not harmless pranks, they

involve making false reports of bomb threats, hostage

situations, murders, shooting, arson and other situations

requiring an immediate emergency response.  And every single

time an emergency service department, police department, a

fire department has to respond to one of these false

threats, there is an inherent risk that there is going to be

a car accident or whether there is an armed force that is

about to show up to an unsuspected individual's home as

happened in Kansas, there is a risk of death, it's not just

a risk, it actually happened.

So swatting calls waste police resources and

divert these resources away from dealing with real

emergencies that could need those police resources at that

time.  As you have seen in this case, swatting allows

someone from the comfort of their own home thousands of

miles away to cause mass disruption.  So there is a critical

need for these cases to defer people from engaging in

swatting behavior.  This behavior comes with a very real

cost to innocent victims, to police departments and to

society.

The defense counsel referenced a psychological

1    evaluation.  I just want to highlight that that report

2    doesn't suggest that the defendant fails to grasp right from

3    wrong, doesn't say he had some type of diminished capacity

4    that prevented him from appreciating the seriousness of this

5    conduct.  What does it say?  What kind of picture did it

6    paint?  It painted a picture of an angry person who always

7    feels like a victim.  He was prone to exaggeration to gain

8    sympathy from others.  So I ask that the Court view the

9    defendant's statement in light of those assessments by

10   Dr. Cook.

11             In conclusion, Your Honor, the government

12   respectfully submits that the careful consideration of the

13   factors set forth in 18 USC Section 3553(a) to leave the

14   Court to vary upward of the advisory guideline range of

15   eighteen to twenty-four months.  A sentence of between

16   eighteen to twenty-four months does not sufficiently account

17   for the seriousness of the offense which impacted nearly

18   2,000 children, the defendant's history of engaging in

19   online harassment of others for years, the need to

20   specifically deter this defendant from engaging in cyber

21   attacks in the future and the need to deter others from

22   engaging in similar swatting behavior.  The government

23   submits that a range of thirty to thirty-seven months

24   imprisonment is necessary in this case to support the

25   sentencing purposes set forth in Section 3553(a).

1          And last as referencing the PSR, the government

2     request that the Court order the defendant to pay the

3     Georgetown Police Department $1,532.40 in restitution for

4     their expenses in investigating this case.

5          Thank you, Your Honor.

6          THE COURT:  All right.  We're going to take a

7     brief recess.

8          (A brief recess was taken.)

9          THE COURT:  All right.  Please be seated.

10         Mr. Malik.

11         MR. MALIK:  I did speak yesterday with my

12    client's mother, Judy Landes, and she did mention about

13    wishing to address the Court.  And I believe she spoke with

14    Mr. Landes and he said is my grandmom going to get a chance

15    to speak?  I did ask her if she wanted to do that.  She said

16    if the Court were to allow me, I would like to do that, so I

17    ask if that would be a problem, Your Honor.

18         THE COURT:  I'm going to let you do it, but a

19    better time to do that is before you and Mr. Wenger address

20    me.

21         MR. MALIK:  Agreed, Your Honor.  I didn't expect

22    that that was going to be the case because we didn't talk

23    about that last night, so --

24         THE COURT:  All right.  Bring her on up.

25         MR. MALIK:  Please come forward, Ms. Landes.  I

1    agree, Your Honor, I am sorry about that.

2              THE COURT:  Good morning, Ms. Landes.

3              MS. LANDES:  Good morning.

4              THE COURT:  Can you say for the record your full

5    name?

6              MS. LANDES:  Judy Marie Landes.

7              THE COURT:  Okay.  Go ahead.

8              MS. LANDES:  I thought I would talk.  I was

9    listening to the prosecutor say his deal, and that doesn't

10   tell what Stephen went through.  You can say what you want,

11   but I was there and saw a lot of what happened.  And all the

12   stuff that happens shouldn't have happened to anybody.  We

13   called the police.  We called FBI.  And they'd say there was

14   nothing they could do.

15             And I know, I was there when Stephen.  I was

16   sitting on the couch with him when he called FBI two

17   different times.  And they said there wasn't nothing they

18   could do, that he would just have to handle it himself and

19   do it back to him or whatever.  And I told him then, that's

20   not right.  He said what are we suppose to do?  I didn't

21   know.

22             And I called the FBI myself one time and they

23   told me the same thing.  But that's not right.  What do we

24   do?  And I know I talked to Rodney.  He called a lot and

25   would curse me out and everything.  And I told him one time,

1    he said, well, I work with the FBI, I have worked with them,

2    and that's the same thing that Mike Virus said that he

3    worked with the FBI, too, and that they were going to get

4    Stephen in trouble.  And I said why don't you just leave him

5    alone.  And Rodney said, "Well, I'll never leave him alone.

6    I'm going to take him down."  And that's what he told me.

7              And then they were saying he wasn't a victim.  I

8    know he was a victim, and so was I.  And I never got the

9    party line.  So I don't know what we should have done.

10             THE COURT:  All right.

11             MS. LANDES:  But anyway, I didn't know what to

12   tell him other than I didn't think that was right.  And he

13   kept asking me, "Well, what do I do?"  And I just didn't

14   know.

15             THE COURT:  All right.  Thank you, Ms. Landes.

16             MR. MALIK:  Thank you, Your Honor.

17             THE COURT:  So Mr. Malik, are you finished?

18             MR. MALIK:  Yes, Your Honor.

19             THE COURT:  And Mr. Wenger, are you finished?

20             MR. WENGER:  Unless the Court has any questions,

21   yes.

22             THE COURT:  Actually there was one thing I

23   wanted to check.  Let me just check my own recollection

24   here.

25             All right.  So I have listened to the various

1    arguments of counsel.  I have read all the papers.  I have

2    heard Mr. Landes, his grandmother, and Ms. Johnson and the

3    principal, whose name I think is Mr. Stong.  So just in

4    terms of restitution I am going to order the restitution to

5    Georgetown Police Department.  In terms of a fine, I'm not

6    going to impose a fine, because I don't think Mr. Landes has

7    any ability to pay.  I am going to sentence him shortly.

8    And I have considered the relevant factors the law requires

9    me to consider in United States Code Section 3553(a), they

10   begin with the sentencing guidelines which are eighteen to

11   twenty-four months which I take as a starting point, but I

12   am obligated to impose a sentence that is sufficient but not

13   greater than necessary to achieve the purpose of the

14   sentencing.  I think the sentence I will impose will do

15   that.

16              So there are a number of different things that

17   I'm supposed to consider, some of which have been mentioned

18   by the attorneys.  One thing is the nature and circumstances

19   of the offense.  The need for the sentence imposed to

20   reflect the seriousness of the offense, promote respect for

21   the law, provide just punishment for the offense.  And here

22   as Mr. Malik has stated I think both in writing and

23   certainly today, so I don't believe Mr. Landes -- I guess in

24   writing he said he acknowledges this much, too, and that

25   seems true, but essentially this is an incredibly serious

1    offense because of all the consequences that can flow from

2    this sort of call.  You have the police responding to the

3    location that Mr. Landes had given them, a person who

4    supposedly is making the call, you have the school, you have

5    Wal-Mart, dealing with the school, you have literally

6    thousands of children who are disrupted, not really the

7    right word, it kind of understates it, they're in a panic

8    drill.  You have got the ripples that go out with that with

9    the parents, with the other people who are responsible.  And

10   the panic goes beyond just the students and the teachers and

11   the staff of the school.  And, of course, the climate where

12   there are random large scale well-publicized crimes that

13   occur at schools including elementary schools, high schools,

14   there is reason why the guidelines treat any bomb threat

15   essentially as being something that requires or should get

16   serious consideration at least for a sentence of

17   imprisonment.

18              Here, and I think really the reason for the

19   request of the government to vary upwards, I think the

20   prosecutor said, I forget, somebody said, described what

21   Mr. Landes did here as essentially ramping up the normal

22   swatting call seriously by involving the school.  And that's

23   really something that's -- the guidelines are written more

24   as if he just called and said he was Mr. Phipps and he was

25   holding hostages there.  I guess to make sure he got a

1    response is why he called the school because when you're

2    making threats that involve children, there is absolutely no

3    choice but to respond as if it's true.  Most of the time it

4    seems that they aren't, but occasionally they are.  So

5    that's the reason why a sentence of imprisonment is I think

6    required by the nature and circumstances of the offense.

7    And why it's a fair concern, or fair thing to think about

8    sentence that exceeds the sentencing guideline range of 18

9    to 24 months because the disruption in this case is much

10   greater than is typical perhaps with these sorts of calls.

11            I need to consider the need for adequate

12   deterrents to the defendant and to protect the public which

13   means when Mr. Landes is released, is he likely to do this

14   sort of thing again.  There was some statistic presented by

15   Mr. Malik that came from the psychological evaluation of

16   Dr. Cook which suggested that eight percent recidivism rate.

17   That was lower than is typical of something or another.  I

18   never fully got the point other than the psychologist is

19   saying based on the test he did he thinks Mr. Landes is less

20   likely than most to recidivate.

21            In the normal course even without the

22   psychologist given that Mr. Landes has never been in prison

23   before, one would think that the prison sentence even if it

24   stopped today would be a reasonable attempt to deter him

25   from doing this again.  So I think that that particular --

1    when I think about that, that doesn't really require any

2    greater sentence than what he's already served.

3           I'm supposed to consider the personal

4    characteristics of the defendant and this is really I think

5    what Mr. Malik was stressing.  And I think part of the

6    personal characteristics, and this may also be worked into

7    the nature and circumstances of the offense is history,

8    whatever it might be exactly between Mr. Landes, Mr. Phipps,

9    and maybe other individuals of swatting each other and

10    generally doing things from the anonymity of their homes

11    across the country, where two people are across the country.

12           And it's hard for me to -- I accept what his

13    grandmother said that they reported it to the police or the

14    FBI at least a couple of times, and that there wasn't any

15    law enforcement response essentially.  I hear that, I hear

16    an analogous argument in a lot of cases which is, I don't

17    know whether it happens in New Mexico, but you get two guys

18    who are beefing with each other in Delaware and instead of

19    using computers, they each have guns, and when they see each

20    other they start shooting, and they're both saying well,

21    self defense, and in the course of shooting, bystanders get

22    hit.  In fact I think that was what the prosecutor said,

23    innocent bystanders caught in the crossfire.  Even before

24    the prosecutor said that, that's what a lot of it seems to

25    me is about the innocent bystanders who are kids in this

1    case and Wal-Mart for that matter, and they're caught in the

2    crossfire.  And the fact that they're caught in the

3    crossfire if there were something and this was Mr. Phipps

4    versus Mr. Landes who is more to blame, I don't know.  I

5    don't have enough information to know the answer to that.

6    Mr. Malik mentioned Mr. Phipps' case which I do have

7    assigned to me, but nothing has happened in that case that

8    has caused me to have any knowledge about it.  There has

9    been no guilty plea, no hearings other than the fact that I

10   have him as a defendant and that he's involved in this case.

11   I don't know anything else about his case.

12            I find generally that it seems to me that -- I

13   have trouble crediting things that Mr. Landes says.  I think

14   he's prone to exaggeration.  For example, I don't believe he

15   wanted to get caught, which he said before and said again

16   today.  If he wanted to get caught, when the Delaware State

17   Police called him up on July 12th of 2018 investigating this

18   very crime, he wouldn't have denied that it was he who did

19   it and said no, it was Mr. Phipps.  This was I think -- I

20   think the crime was in May, this was two months later.

21   There is other things to me that just don't suggest that

22   that's very credible.

23            I did read the psychological report and I accept

24   because there was a psychological report in 2004 that said

25   posttraumatic stress disorder, I think he said attention

1   deficit disorder, there was some other diagnosis, they were

2   kind of consistent in two different time frames.   Sometimes

3   a psychiatric or psychological report seems to me to be

4   germane to the sentencing.   The diagnoses to me seemed to

5   have nothing to do about the crimes, and so therefore I

6   don't really -- they don't affect my judgment as to what the

7   sentence ought to be.

8              I appreciate, I think one of the diagnoses of

9   Dr. Cook which I think I wrote it down, but it was something

10  Mr. Malik mentioned kind of I wouldn't call it avoidance of

11  persons -- avoidant personality disorder reflecting his

12  pervasive pattern of social convenient, hypersensitivity to

13  negative evaluation by others.   Obviously I'm not a

14  psychologist or psychiatrist, but that does seem to be --

15  and I never actually heard of it before the other day that

16  this was a disorder, but it does seem to apply pretty aptly

17  to the picture of Mr. Landes has painted through all the

18  papers that I have been provided.   And so I take into

19  account these -- I take into account the history, and I do

20  to some extent, the government points out chat line comments

21  to show callousness and boasting after the event.   I can't

22  take -- it seems that that's sort of characteristic of

23  people on the internet, that's the way they talk.   And so I

24  don't take that to be quite as bad a sign as what the

25  government says.   It's certainly not good, but it doesn't

1    necessarily enhance this that much for me.

2              One thing, though, that does kind of go to the

3    callousness, clearly the defendant is completely familiar

4    with swatting, busy talking about various known swatting

5    stories.  I think that he knew exactly when he called the

6    schools what he was doing, when he called the schools and

7    Wal-Mart, and he knew the, so to speak the scope of the risk

8    that he was causing.

9              So I'm also supposed to consider the need to

10   avoid sentencing disparity.  I mentioned that, but I don't

11   really have any information that would impact that

12   consideration.

13             And so when I consider all these things together

14   I cannot do what Mr. Malik is asking, and Mr. Landes, too,

15   for that matter, I cannot grant a variance downward.  The

16   nature and the circumstances of the offense are simply too

17   serious for that.  And in view of the seriousness of the

18   offense, and notwithstanding some mitigating characteristics

19   of the defendant, I think a modest upward variance is

20   warranted.  But I think three months above the top of the

21   otherwise appropriate guidelines is what is an appropriate

22   upward variance here.  So that's what I'm going to do.

23             Mr. Landes, if you and Mr. Malik will come

24   forward.  So the sentence that I intend to impose is this:

25   Pursuant to the Sentencing Reform Act of 1984 it is the

1   judgment of the Court the defendant, Stephen Scott Landes,

2   is hereby committed to the custody of the Bureau of Prisons

3   to be imprisoned for a term of 27 months.  Upon release from

4   imprisonment, you will be placed on supervised release for a

5   term of three years.  Within 72 hours of release from the

6   custody of the Bureau of Prisons you should report to the

7   probation office in the district to which you are released.

8   While on supervised release you shall comply with the

9   mandatory and standard proceedings of the supervision.  In

10  addition you shall comply with the special conditions as

11  listed in paragraph 140 of the pre-sentence report.  The

12  Court finds that you have restitution in the amount of

13  $1,532.40 to the Georgetown Police Department in Georgetown,

14  Delaware.  And this amount is compensable under the

15  Mandatory Victims Restitution Act of 1996.  Restitution is

16  due immediately.  It is recommended you make payments from

17  any wages you earn in prison and report to the Bureau of

18  Prison to the Inmate Financial Responsibility Program.  Any

19  portion of the restitution that is not paid in full at the

20  time of your release from imprisonment shall become a

21  condition of supervision.  The Court will raise the

22  requirement for payment of interest on the restitution.

23  Following supervised release you shall not pay less than $50

24  per month, or ten percent of your gross monthly income,

25  whichever is greater, toward restitution.  Payments will be

1    collected by the clerk of the United States District Court

2    for distribution to the victim as noted in the pre-sentence

3    report.   It is further ordered that you pay the United

4    States a special assessment of $100 which is due

5    immediately.   The Court finds that you do not have the

6    ability to pay a fine, the Court will waive a fine in this

7    case.

8         Mr. Malik, do you know of any reason other than

9    those already stated why sentence should not be imposed as

10   announced?

11        MR. MALIK:  No, Your Honor.

12        THE COURT:  Mr. Wenger?

13        MR. WENGER:  No, Your Honor.

14        THE COURT:  It is the order of the Court that

15   sentence be imposed as stated.   The clerk's office shall

16   prepare the judgment.   My deputy clerk shall enter the

17   judgment of collection.   A complete copy of the pre-sentence

18   report will be prepared.   Copies of the pre-sentence report

19   shall remain confidential.

20        Mr. Landes, you have the right to appeal within

21   14 days after entry of the judgement of conviction.   You

22   need to discuss your right to appeal with counsel.   If you

23   cannot afford the cost of appeal, you may file a request for

24   petition without paying those costs.   If there is an appeal,

25   appeal counsel has access to pre-sentence report except the

1    recommendation from the probation office are not to be

2    disclosed to counsel.  Mr. Landes, when you get out of

3    prison, and it's not actually going to be that long from

4    now, probably because assuming you get good time credits,

5    that will probably knock about four months off of your 12,

6    and you'll probably be going to a halfway house somewhere

7    before that, but you will be in prison for a while, and when

8    you actually get released, one of the conditions of

9    supervised release is essentially that you stay out of these

10   party line chat rooms.  No good can come of that for you.

11   Even after three years is up, no good can come of that for

12   you.  You have got to find some other way to occupy your

13   time.  And if you get swatted in the future, you need to

14   continue to call law enforcement.  Every time it happens,

15   you need to call law enforcement.  What they do with it, I

16   can't help you there.  But you got to call and tell them

17   what you know because you can't take the law into your own

18   hands.

19                    Anything further, Mr. Malik?

20                    MR. MALIK:  No, Your Honor.  Thank you.

21                    THE COURT:  Mr. Wenger?

22                    MR. WENGER:  No, Your Honor.

23                    THE COURT:  All right.  We'll be in recess.

24   Thank you.

25                    (Court recessed at 11:10 a.m.)

1          I hereby certify the foregoing is a true
and accurate transcript from my stenographic notes in the
2    proceeding.

3
                                        /s/ Dale C. Hawkins
4                                     Official Court Reporter
                                        U.S. District Court
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25